**FARMERS FEED AND SUPPLY CO.,**
Plaintiff,

v.

**UNITED STATES** of America and Interstate Commerce Commission,
Defendants.
**Civ. No. 65–C–3009–W.**

United States District Court
N. D. Iowa, W. D.
May 2, 1967.

W. J. Giles, III, Sioux City, Iowa, Nelson, Harding, Acklie, Leonard & Tate, Lincoln, Neb., for plaintiff.

John H. D. Wigger, Department of Justice, Nahum Litt, Interstate Commerce Commission, Washington, D. C., for defendants.

### MEMORANDUM

Before VAN OOSTERHOUT, Circuit Judge, and McMANUS and HANSON, District Judges.

HANSON, District Judge.

This is a ruling on a complaint brought to review certain Orders entered by the Interstate Commerce Commission.

This case was heard by a three judge court upon the record as developed in the Interstate Commerce Commission proceedings.

By Orders entered February 4, 1963 and June 4, 1963, the Commission instituted an investigation into the operations of the respondents with a view to determining whether they had been or were engaging in the transportation of property in interstate commerce as common or contract carriers by motor vehicle in violation of Title 49, Sections 303(c), 306(a) and 309(a) of U.S.C.A.

The hearing examiner concluded that the trucking operations were not conducted as an incident to the primary business of dealing in grain, feed, feed ingredients, and mixing of feed ingredients but rather constituted for hire carriage. The Commission adopted the hearing examiner's statement of facts which said in part that:

"The investigation of the activities of Farmers by the Commission's field staff commenced in February 1962. At that time the business of the respondent was conducted as a partnership, but later, from April 1, 1962, to January 1, 1963, it was operated by Mr. Heusinkveld as a sole proprietor. On the latter date Farmers was incorporated, but continued to be controlled and managed by Mr. Heusinkveld as its president and majority stockholder. Farmers has not held, nor does it now possess, any authority from the Commission to transport property in interstate or foreign commerce."

"Farmers is engaged in the purchase and sale of grains and, to some extent, the for-hire transportation of Government corn. It also buys and sells feed ingredients and conducts a business operation involving the custom mixing of mineral supplements. (There is no claim that any transportation of grain is illegal.) * * * Farmers operates 9 tractors and 15 semitrailers. All of the trailers are owned by Farmers, whereas the tractors are permanently leased from other concerns or individuals."

"Its customers generally contact Farmers to seek information regarding the availability, cost, and possible delivery date of material. Calls may be the result of previous transactions or the distribution of postal cards listing particular products, especially salt, and their prices."

"In 1963 the respondent advised that it had lost no money due to bad debts. Its sales have been confined to retailers, merchants, dealers and manufacturers of feed. No warehouse records are maintained. It estimated that about 40 percent of all purchases move through the warehouse and 60 percent is transported directly from supplier to customer. In 1963 the corresponding figures for salt were 30

percent through the warehouse and 70 percent direct."

"Since May 1963, Farmers has been handling Hardy salt which is moved by rail from Michigan to Boyden. This salt is stored in Farmers' warehouse and then peddled out by respondent to customers to whom it is sold by salesmen of the manufacturer. Farmers, however, still deals in Kansas salt produced by the respondent salt companies."

"All shipments of salt from Carey to Consumers of Storm Lake and at Sioux City were by authorized carriers. * * * Carey's salesmen have been instructed not to solicit orders for salt to be turned over to a private carrier for pickup and delivery, nor to advise any salt purchaser where he can place an order for delivery by a private carrier."

"Substantially similar directives (similar to the Carey directive) for the guidance of all salesmen were also issued at various times between 1958 and 1962 by Barton, American, and Morton (salt companies). * * *"

"The evidence submitted by the Bureau (of Inquiry and Compliance) concerning specific shipments to Farmers from its suppliers and from the respondent to its customers, and the invoices, purchase orders, or other documents covering such shipments, were generally confined to transactions occurring during the latter part of 1961 or early 1962."

The Commission also abstracted in some detail the evidence concerning the transactions between the respondents and their customers. Typical of some of the transactions prior to 1962 was the way in which Farmers' Cooperative of Cherokee, Iowa, purchased salt. A salesman of the Morton Salt Co. would solicit the business. Indications as to the need of salt would be given without any advice as to who should deliver it. The salt would be delivered by Farmers Feed and Supply Co. generally within one week. The invoice was rendered by Farmers' driver and the salt paid for at time of delivery. The Commission admitted that the transactions changed after 1963 and the nature of the transactions will be discussed more in relation to the allegation that the evidence was insufficient as to Farmers Feed and Supply Co., a corporation.

The Commission ordered:

"It is ordered, That respondents H. G. Heusinkveld, an individual, doing business as Farmers Feed & Supply Co., and Farmers Feed & Supply Co., a corporation, of Boyden, Iowa, be, and they are hereby ordered and required to cease and desist, and thereafter to refrain and abstain from operations, in interstate or foreign commerce, of the character found in said report to be unlawful, unless and until appropriate authority therefor is obtained;

It is further ordered, That this proceeding, as to respondents Howard N. Verrips as a partner with H. G. Heusinkveld; The American Salt Corporation, the Barton Salt Company, The Carey Salt Company, Morton Salt Company, Iowa Public Service Company, Consumers Supply Corporation, Carroll Swanson Sales Company, Iowa Limestone Company, Cargill, Incorporated, and Farmers Elevator Company, be and it is hereby, discontinued."

The present action to review the Order of the Interstate Commerce Commission was instituted by Farmers Feed and Supply Co., Inc. alone. H. G. Heusinkveld, individually, is not a party to this action and as to him the Order of the Commission is final.

The complaint in this case alleges in substance as follows:

1. That plaintiff's operations are clearly bone fide private carriage and are exempt under Section 303 (b) (9) of Title 49, U.S.C.A.

2. That the refusal of the Commission as a whole to consider the case denied plaintiff due process.

3. That the requested continuance should have been granted and the

Commission erred in not so ordering.

4. That there is no evidence to show that any of the operations of the Corporation were unlawful in that all of the evidence relating to unlawful transactions relate to operations conducted prior to 1963.

5. That the report and order of the Commission fails to distinguish between operations which are lawful and those which are unlawful.

6. That the memoranda prepared by the Bureau investigators should have been produced for inspection by plaintiff and the Commission erred in failing to so order.

7. That there is insufficient evidence to find that any operations of H. G. Heusinkveld were unlawful.

8. That a substantial number of exhibits and much testimony was admitted which should not have been admitted under the applicable rules of evidence.

In Red Ball Motor Freight v. Shannon, 377 U.S. 311, 84 S.Ct. 1260, 12 L.Ed.2d 341, the court held that Title 49, Section 303(c) merely codifies the primary business test. The contention that this statute was intended to per se outlaw specific operations was rejected. Tests that go into determining whether transportation is the primary business or only incidental to another business are: the comparison of the assets and payroll going into transportation as opposed to the rest of the business, whether the goods are sold before they are transported, direct delivery which by-passes any warehousing, solicitation of the order by the supplier rather than the truck owner, inclusion in the sales price of an amount to cover transportation costs, and whether risk of damage or drop in market value is absorbed by the consumer.

During the year 1961 and at least through part of 1962, the operations of H. G. Heusinkveld were clearly primarily transportation in that most if not all of the factors in the primary business test would apply to him. The Commission, in attempting to find that the corporate business was also primarily transportation, stated that: "Since the corporation is the alter ego of Heusinkveld, and there is evidence of continuation of the operations of the latter, the order should also apply to the corporation." It was on January 1, 1963, that the corporation began to operate the business and the corporation was not involved prior to that date.

The Commission's statement of facts details the evidence of the transactions prior to 1963. It was noted that a 1963 advertising flyer showed the corporation to be buying and selling all kinds of grains and acting as a wholesaler and distributor of salt, oystershell, alfalfa pellets, bran, midds, linseed meal, soybean meal, cottonseed meal, tankage, meat scraps, polyphos, dical, limestone and dried whey. The flyer also stated that the corporation manufactures mineral supplements and does custom mineral mixing. Customers are requested to order on post cards or call in orders and prices are furnished.

The Commission's statement of facts says that in 1963 the corporation lost no money on bad debts. Its sales were confined to retailers, merchants, dealers and manufacturers of feed. No warehouse records are maintained. It was estimated that 40% of the merchandise moves through the warehouse. For salt the figure is 30%. Since 1963 changes have taken place in that the mineral mixing business increased. Special machinery for producing feed supplements was installed. Arrangements were made for a warehouse, a straight truck and a full-time delivery employee at Spencer, Iowa. Changes were made in accounting procedures. The corporation hired a former salesman of the American Salt Co. More business was done at the Boyden warehouse. The corporation began to buy salt and oystershells by railroad car.

The statement of facts of the Commission says that this salt shipped in by rail car is then delivered to customers who placed their orders through sales-

men other than the corporation's salesmen. While there was evidence that this type of operation existed prior to 1962, from the record it is doubtful that it continued to 1963, but in any event, this does not constitute for-hire transportation nor acting as a common carrier as the salt was shipped to Farmers in railroad cars; and, the instructions by the salt companies to their employees prohibited such conduct if it resulted in transportation considered illegal by the Interstate Commerce Commission.

The Commission in its statement of facts also summarized the testimony of the numerous customers and farmers who testified. The evidence showed that several of the corporation's customers bought products in 1963 and that the payments were made on delivery. But there was nothing to show that this was illegal. The evidence does not show that the orders were solicited by salesmen other than those of the corporation itself. The evidence does not show these to be direct deliveries from the source to the customer. With respect to salt there is evidence that it was being shipped by rail.

The only evidence that would indicate any for-hire transportation in 1963 was from a customer in Hawarden, Iowa, who said that they purchased salt through some advertising cards left with them by a Barton Salt salesman. The salt was delivered by Farmers Feed & Supply Co. But it again is not clear that the delivery was a direct shipment from the source or whether it was warehouse or whether it was shipped by rail. The Commission's findings include a similar statement with respect to a Cooperative at Cherokee but the record shows that the representative of that cooperative, a Mr. Yoder, said the salt was never solicited by a salt company salesman.

■ There is no substantial evidence in the record to show that any illegal activities were conducted by the plaintiff after January 1, 1963, being the time the corporation was organized. There is no evidence in this case which would justify piercing the corporate veil. It is a closely held corporation. In fact, there is some indication that the stock is held solely by H. C. Heusinkveld but a one man corporation can be valid. There is no substantial evidence to show the corporation to be a sham.

■■ The mere fact that a person is the sole stockholder of a corporation does not of itself make him the alter ego of the corporation. Bass v. Shutan, 259 F.2d 561 (9th Cir.). The corporate entity will be disregarded only under exceptional circumstances such as where a corporation is a mere shell, serving no legitimate business purpose, and is used principally as an intermediary to perpetrate fraud or promote injustice. Bankers Life and Casualty Company v. Kirtley, 338 F.2d 1006 (8th Cir.) (Iowa).

An examination of the entire record in this case does not disclose a rational basis for the conclusion reached by the Commission that a cease and desist order should issue against Farmers Feed & Supply Co., a corporation. Therefore, the Order cannot stand. Three "I" Truck Line, Inc. v. I. C. C., D.C., 246 F. Supp. 410. It is the duty of this court to review the record and determine the substantiality of the evidence on the record as a whole. N. L. R. B. v. Grand Foundries, Inc., 362 F.2d 702 (8th Cir.); Universal Camera Corp. v. N. L. R. B., 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456.

■ The Order of the Interstate Commerce Commission with respect to Farmers Feed and Supply Co., Inc., must be set aside because of lack of substantial evidentiary support for the findings upon which such Order is based. The temporary injunction entered by the Court must be dismissed for the reason that our decision makes injunctive relief unnecessary.

Accordingly, it will be ordered that the Order entering the cease and desist Order against Farmers Feed and Supply Co., a Corporation, is reversed and set aside. It will be further ordered that the temporary injunction be dismissed.